NOAH GRAVES, Administrator of the Estate of AMERICA V. GRAVES, Respondent, v. ATCHISON, TOPEKA and SANTA FE RAILWAY COMPANY, a Corporation, and BASEL W. CLARK, Appellants, No. 41469—227 S. W. (2d) 660.

Division One, March 13, 1950.

*John H. Lathrop, Sam D. Parker, Donald H. Sharp, Waldo Edwards* and *Paul D. Hess, Jr.,* for appellants.

*Robert N. Jones* for respondent.

VAN OSDOL, C.—Action for $10,000 for the death of America V. Graves, which occurred October 19, 1947, at Carpenter Crossing, about three and three-fourths miles west of La Plata, when the 1926 Model T Ford automobile in which she was riding as a guest of her son, Everett Graves, was struck by defendant Railway Company's westbound passenger train of eight coaches drawn by an oil-burning steam engine.

Plaintiff's case was submitted to the jury under the penalty section (Section 3652 R. S. 1939, Mo. R. S. A. § 3652) of the Wrongful Death Act on alleged statutory and common-law negligence in failing to sound warning signals; and on alleged negligence in moving the train over a public crossing at a high, excessive and dangerous rate of speed. The jury returned a verdict for defendants, Railway Company and its engineer, but the trial court sustained plaintiff's motion for a new trial, specifying assignments 1, 16 and 17 of the motion for a new trial as grounds for sustaining the motion. Defendants have appealed.

The assignment 1 of the motion for a new trial, specified by the trial court as a ground for granting the new trial, is as follows,

"1. The verdict is against the evidence and the weight thereof."

The specified assignments 16 and 17 relate to asserted errors in giving instructions.

The trial court's sustention of the motion for a new trial on the ground the verdict was against the weight of the evidence was discretionary. However, such discretion should not be exercised in an arbitrary or unreasonable manner; and, in ▮▮▮ determining whether the trial court properly exercised its discretion in awarding a new trial on such ground, we will examine the record to ascertain if there was sufficient substantial evidence to justify the submission of plaintiff's case to the jury; or to sustain a verdict for plaintiff, the party to whom the new trial was granted. Happy v. Walz, 358

Mo. 56, 213 S. W. 2d 410; Rose v. Thompson, 346 Mo. 395, 141 S. W. 2d 824; Castorina v. Herrmann, 340 Mo. 1026, 104 S. W. 2d 297; Section 115, Civil Code of Missouri, Laws of Missouri, 1943, p. 388, Mo. R. S. A. § 847.115; Supreme Court Rule 3.22. If a plaintiff has not made out a submissible case, errors in instructions are immaterial upon appeal. Oganaso v. Mellow, 356 Mo. 228, 201 S. W. 2d 365; Bootee v. Kansas City Public Service Co., 353 Mo. 716, 183 S. W. 2d 892.

At Carpenter Crossing, Railway Company's double-track line runs in a nearly east-west direction. A public highway, Carpenter Road, crosses defendant's line at approximately a right angle. There is a "fill" or embankment to the eastward along the south of and on the right-of-way. The embankment begins about 80 feet east of the crossing and extends eastwardly about a quarter of a mile in and along the south side of the right-of-way to a point where, at a private crossing, there is a small gap or opening in the embankment, and then the embankment continues on eastwardly. From the west end of the embankment to the east side of the crossing the right-of-way is "level, or a little bit lower than the track." On the south, the highway, from a point 200 feet back from the crossing, inclines at a grade of about 10% until it comes to a "pretty steep" incline up a graveled surface of 11 or 12 feet extending to the south rail of the south (eastbound) track. When "you come up to the crossing going North, you have to come up a pretty steep incline to get up on the track, and of course when you are looking East you can't see a train until you get pretty near up onto the tracks . . . you can't see till you get right up to the track, I will say in about a foot of the eastbound track." Railway Company's tracks are 4 feet-8½ inches gauge, 14 feet apart, center line to center line. Thus, it seems, the distance from the southerly extent of the graveled surface to the southerly rail of the north (westbound) track is about 28 feet.

A crossarm "Railroad Crossing" sign (black 9-inch letters with 1 1/4-inch sweep on a white background) sits north of the north track and east of the traveled portion of the highway. The center of the crossarm is 7 feet from the ground. The sign is visible to a highway traveler approaching from the south at all points within at least 350 feet of the crossing. Crossing wings, and steel rails on either side of the roadway are to be seen at least from and throughout such distance. Glancing obliquely to the right, such traveler can see the crossarms and upper portions of telegraph poles above the embankment and aligned throughout a distance of several hundred feet to the eastward. [Photographs introduced into evidence disclose that, from a point in Carpenter Road 50 feet south of the crossing, one has a view of the railroad tracks east of the crossing for a distance of at least 200 feet; and that, from a point in the center of the highway 25 feet south of the center of the north (westbound) track, a traveler

can see the track as far as 4600 feet east of the crossing, although there is a curve beginning at a point 3900 feet east of the crossing.] The railroad tracks are straight east of the crossing for nearly three fourths of a mile (3900 feet); and trains approach from the eastward on the north (westbound) track, moving up a slight grade which continues to a point about 1100 feet west of the crossing.

At about twenty minutes to five o'clock the afternoon of October 19, 1947, the sky was clear; the sun was low in the west; and, we infer, a three-mile-per-hour wind was blowing west-southwest. Plaintiff's decedent was a passenger in the automobile belonging to her son Everett. She and Everett had been visiting the home of another son, plaintiff Noah Graves, who resides on the east side of Carpenter Road, a fraction over one-half mile south of Carpenter Crossing. Everett, driving, started from Noah's home and went north up Carpenter Road. The automobile passed onto Carpenter Crossing, and was struck by Railway Company's train which, according to the testimony of defendant engineer and the fireman, was moving 75 or 80 miles an hour. The train was a "second section," and had left Shopton late. The defendant engineer had not seen the automobile. The fireman "did see up the track just in time to see the car . . . apparently I didn't see anything at first, then this car drove right in view of me . . . the first it came into view of me it was just about on the Eastbound track." No other witness testified of having seen the automobile approach or pass onto the crossing and in front of the train. At the "same time" the car was struck, the engineer "applied the emergency." Both of the occupants of the automobile were killed, and the demolished vehicle was carried westwardly 4710 feet. About that time there was an oncoming freight train, and its crew assisted in removing the bodies and the wreckage of the automobile from beneath the pilot of the engine.

At the time of the collision, a passenger seated in the first or second coach of the train was playing cards with a friend. The passenger testified he knew the engine had a whistle; he didn't know about the bell. He had ridden on the train from Chicago and had heard the whistle blow several times along the line. "I wasn't paying particular attention, but I heard it blow several times coming along." The last time he had heard the whistle was about thirty minutes before the train reached La Plata. "That is when we remarked about the eeriness of the whistle." Having been asked if he knew whether a whistle was sounded or not, the witness said, "No, I didn't hear it. If it was sounded we didn't hear it in our group there." He did not hear any whistle or bell. "As near as I can say, I don't believe there was" any eerie sound just before the fatal occurrence. Upon being asked if, at the time of the occurrence, he thought "about whether any

whistle was sounded," the witness answered, "No, I didn't at the time. We did afterwards, and talked about it."

Plaintiff Noah Graves, who, as stated, lives a little over a half-mile south of the crossing, can more plainly hear the whistles of Railway Company's trains when he is at his home than when he is up at the track. "I don't know why that is." He remembered hearing only one train "that went by" and that was "shortly" after his mother and brother left. He heard no train whistle. He does not listen "all times. I do at times, if my folks are there and leave, always listen." He did not know if the train he heard was the one involved, but he did not hear any other at the approximate time.

Both the defendant engineer and the fireman testified the whistle had been sounded from the time the train had reached the signal post, 1996 feet east of the crossing, and the whistling was continued until the train reached the crossing. The engineer further testified the bell of the engine was continuously ringing.

Other evidence will be mentioned in the course of the opinion.

 On the issues of alleged negligence in failing to sound warning signals, defendants-appellants contend plaintiff failed to adduce any substantial evidence the bell or the whistle was not sounded, and there was positive evidence introduced by defendants that the bell and the whistle were sounded when the train was approaching the crossing. Defendants-appellants urge that, to constitute substantial evidence that a warning signal was not sounded, testimony must come from a witness in close proximity to the track, conscious of its presence and so situated as to be able to hear. The cases of Willsie v. Thompson, 359 Mo. 775, 223 S. W. 2d 458; Knorp v. Thompson, 357 Mo. 1062, 212 S. W. 2d 584; and Connole v. Illinois Central R. Co., Mo. App., 21 S. W. 2d 907, are cited. On the other hand, plaintiff-respondent contends the negative evidence introduced by him was substantial and sufficient to make out a submissible case, citing Borrson v. M. K. T. R. Co., Mo. Sup., 161 S. W. 2d 227; Wright v. St. Louis-San Francisco R. Co., 327 Mo. 557, 37 S. W. 2d 591; and Peppers v. St. Louis-San Francisco R. Co., 316 Mo. 1104, 295 S. W. 757. Thus we have the question whether the negative testimony of the passenger on the train and of plaintiff, Noah Graves, was evidence of sufficiently substantial character to justify the submission to the jury of the issue of negligence in failing to sound warning signals.

While in the Borrson case the defendant-appellant did complain there was insufficient evidence to support the submission of negligence in failing to sound warning signals, such was not the defendant-appellant's real complaint. This court really passed on an instruction tendered by defendant but refused by the trial court. The instruction itself set forth more accurately the true complaint of defendant-ap-

pellant. In substance, the instruction was to the effect that positive testimony is of greater weight than negative testimony. There was no real contention the negative evidence was of no probative value; and this court did not particularly set out the evidence from which it was to be reasonably inferred the witnesses would have heard had the warning signals been sounded. This court gave but a "summary resume" of evidence, positive and negative, and stated the issue whether the signals were sounded was for the jury. Having summarily stated the premise for treating with the true complaint of defendant-appellant, this court held the trial court was right in refusing the instruction. Since the issue was submissible, the weight of the evidence on the issue was for the jury. In the Wright case, plaintiff testified that, when approaching the crossing, he listened for the noise of a train and warning signals, and heard none. In the Peppers case a number of witnesses, who were in a position to listen, testified they did not hear the passenger engine whistle or ring a bell as the train approached Magazine Crossing, although some testified that they did hear the whistle blow for a crossing a half mile or more to the westward.

"Where it is shown that a witness was in close proximity to the track, in a position or situation to have heard the whistle if it was sounded, and was attentive to whether the whistle was in fact sounded, then his testimony that he heard no whistle is substantial evidence of the fact that no whistle was sounded, and it serves to contradict positive evidence to the contrary." Knorp v. Thompson, supra; Stotler v. Chicago & A. R. Co., 200 Mo. 107, 98 S. W. 509; Dodd v. Terminal R. Ass'n. of St. Louis, Mo. App., 108 S. W. 2d 982; Connole v. Illinois Central R. Co., supra; Annotation, 162 A. L. R. 9. In the instant case the testimony of the passenger, in our opinion, does not meet tests of substantiality as stated.

There was nothing in the circumstances of the passenger's journey on the train which would cause him to particularly notice whether warning signals were sounded, although he had heard the whistle blow several times coming along. He had no occasion to listen for, or give heed to a warning signal. His own testimony tends to show he was inattentive. He "wasn't paying particular attention . . ." His attention surely was to some extent engaged in his pastime, his game of cards with his friend. At the time of the collision, he did not give any thought as to whether a warning signal had been sounded. After the occurrence, when he was in conversation with others, he apparently tried to recall whether he had heard a whistle; but he and the others of the group could only conclude that, if the whistle was sounded, they "didn't hear it." The effect of the passenger's testimony is that he was not paying attention, and so did not know whether or not warning signals were sounded. While he may have been in

such a position, being in a coach near the front of the train, that, had he been attentive, he would have heard the whistle, if blown, yet, being in fact inattentive, it could not be reasonably said, we believe, his testimony that he had not heard the whistle was of any probative force in affording a substantial basis for the submission of the issue. Knorp v. Thompson, supra; Connole v. Illinois Central R. Co., supra; Little v. Manufacturers Ry. Co., Mo. App., 123 S. W. 2d 220; 162 A. L. R., supra, at page 64. And we likewise rule the negative testimony of plaintiff, Noah Graves, was of no probative effect in supporting the submission of the issue.

██ Noah Graves was attentive to trains passing at the approximate times his folks had visited his farm and had, in departing, gone northwardly toward the crossing; and, it seems, he was listening for a train the afternoon ██ of the occurrence. We believe his position (a fraction over a half mile south of the crossing), though not in close physical proximity to the crossing, was such as would enable him to have heard the whistle, if blown, especially when his explanation (that he could the better hear the whistle of Railway Company's trains when at home) is considered. It could be reasonably inferred the only train he heard did not whistle. He heard no other train at the approximate time; but there was evidence the train involved was a second section, and there was an oncoming freight about that time. Apparently, he did not see the train involved, and heard no sound of the collision; nor does it seem there was any other fact or circumstance because of which he could identify the train he heard, and say the only train he heard was the one involved in the occurrence. Having heard one train at the approximate time, he evidently did not listen for any other. He said he did not know the train he heard was the one involved. A jury's conclusion that the only train he heard was the one involved would be purely speculative.

There was no substantial evidence introduced tending to show the warning signals were not sounded. All the substantial evidence on the issue tends to show the warning signals were sounded.

██ On the question of the sufficiency of the evidence to sustain the submission of a plaintiff's case on alleged negligence in the train at excessive speed—it has been said that "in the country, between stations, away from congested populations, it is not negligence for passenger trains to run at a rapid speed over road-crossings." Burge v. Wabash R. Co., 244 Mo. 76, 148 S. W. 925; McGee v. Wabash R. Co., 214 Mo. 530, 114 S. W. 33. In the Burge case the witnesses for plaintiff placed the speed of the train at 60 to 70 miles per hour, and 85 to 90 miles per hour. It has also been said, "No conceivable rate of speed is *per se* negligence, except where the law of the State, or a municipal corporation, authorized to do so, prescribes a limit." Maher v. Atlantic & P. R. R., 64 Mo. 267. But these somewhat abstract

statements must yield where relevant circumstances other than the rate of speed appear. Harrell v. St. Louis-San Francisco R. Co., 322 Mo. 551, 18 S. W. 2d 481; Toeneboehn v. St. Louis-San Francisco R. Co., 317 Mo. 1096, 298 S. W. 795; and see Annotation, 154 A. L. R., p. 212 et seq.

Negligent speed at common law is dependent upon all the surrounding circumstances, and, although warning signals are given, where a railroad crossing is dangerous, the railroad company also owes the additional duty to travelers on the highway to pass such crossing at a reasonable rate of speed, proportionate to the danger. Pentecost v. St. Louis Merchants' Bridge Terminal R. Co., 334 Mo. 572, 66 S. W. 2d 533; Herrell v. St. Louis-San Francisco R. Co., supra. In this connection, we may state there was evidence Carpenter Road was used by "just us people that live down there (three families) . . . Lot of times three or four go by a day, lot of times a dozen times a day . . . our children come home there." And some people come to visit or to make deliveries, or to haul "stock out . . . there's people comes through there." The instant case differs from the Herrell and Pentecost cases, supra, wherein the crossing disasters occurred in a town, or city. In our case the crossing is in the country, between stations, away from congested populations.

While the instant case is like the case of Duncan v. C. B. & Q. R. Co., Mo. App., 149 S. W. 2d 920, cited by defendants-appellants, in that the train was "running between two cities," however, in the Duncan case, the surrounding terrain was level—there was no cut or embankment which would interfere with a highway traveler's view of approaching trains, although there was a curve in the track about 330 feet from the crossing. In Toeneboehn v. St. Louis-San Francisco R. Co., supra, the highway crossed the railroad at an angle, the view of the track was obstructed by an embankment, and there was testimony a traveler on the highway must come within a few feet of the crossing and look acutely back to the right in order to see oncoming trains. One witness said he had to be within about four and one-half feet (another witness said, "six or eight feet") before he could look to the right in order to get a clear view of the track. And the crossing was a much-traveled one in a populous area in St. Louis County. In McGee v. Wabash R. Co., supra, involving a crossing "in the country, between stations, away from congested populations," this court noted the modern demands for rapid transportation; and held as a matter of law it was not negligence to move a train at 50 miles per hour over a country crossing, in approaching which crossing the highway traveler's view of the right-of-way was so obstructed by the track's cut through a hill and by a curve, or curves, in the track that one standing at the rail could see four hundred feet up the track; and, standing six feet of the rail, one could see but from

forty to one hundred feet up the track. And see again Burge v. Wabash R. Co., supra.

No case we have examined presents evidence of circumstances like those shown in evidence in the instant case, and we must determine if the issue of excessive speed was submissible in the circumstances of our particular case. Herrell v. St. Louis-San Francisco R. Co., supra.

The train was moving at a high rate of speed, 75 or 80 miles per hour according to the testimony of the defendant engineer and fireman; the train was late, and it moved over three fourths of a mile after the collision. There is, as stated, a view-obstructing embankment on the south side of the right-of-way, the embankment beginning about 80 feet east of the crossing; and there is a rather abruptly-inclined, graveled approach of about 12 feet extending up to the south track at the crossing. On the other hand, there was no substantial evidence warning signals were not sounded, and there was substantial evidence warning signals were sounded. There was no rain or fog or other atmospheric condition, in the clear, light, late afternoon of October 19th, which veiled or clouded a view down the track, and of an approaching train. From a point at or south of the south rail of the south (eastbound) track, the crossing is level to the north (westbound) track where the collision occurred; before reaching the south track, the traveler can see over three fourths of a mile to the eastward. Approaching from the south, the highway traveler at a distance of 50 feet from the crossing may view at least 200 feet of the line to the eastward, which view is extended as and until the traveler reaches a point south of the south track where the view has become extended to over three fourths of a mile to the eastward, as stated. The highway approaches the railroad at "approximately a right angle." The crossing itself is not a concealed one. The crossing sign may be plainly seen by the northbound highway traveler when approaching from and throughout a distance of at least 350 feet. The aspect of the crossing's approach plainly discloses the appearance of a country railroad-crossing. Here we have no busy crossing in a populous community or city as were the crossings in the Pentecost case, supra; in Montague v. Missouri & K. I. Co., 305 Mo. 269, 264 S. W. 813; and in Benton v. Thompson, 236 Mo. App. 1000, 156 S. W. 2d 739, cited by plaintiff-respondent. In the circumstances we believe the issue of defendants' negligence in moving the train at a high, excessive and dangerous rate of speed should not be submitted to a jury.

[5] The order granting the new trial should be reversed, and the cause remanded with directions to reinstate the verdict for defendants. It is so ordered. *Lozier* and *Aschemeyer, CC.,* concur.

PER CURIAM:—The foregoing opinion by Van Osdol, C., is adopted as the opinion of the court. All the judges concur.