In the Matter of the ESTATE of Louis FOX, Jr., also known as Louis Fox, Deceased.

Dorothy DeMANUELE, (Plaintiff) Appellant,

v.

MERCANTILE TRUST COMPANY, Executor of the Estate of Louis Fox, Deceased, (Defendant) Respondent.

No. 31337.

St. Louis Court of Appeals.

Missouri.

June 14, 1963.

Donald S. Hilleary, Clayton, for appellant.

James C. Jennings, St. Louis, for respondent.

WOLFE, Judge.

This is an action against the Estate of Louis Fox, Jr. for the value of services alleged to have been rendered to the decedent. It was filed in the Probate Court and certified to the Circuit Court for trial. There was a trial by jury and a verdict for the defendant. From the judgment following, the plaintiff prosecutes this appeal.

The plaintiff asserts that an instruction given at the request of the defendant respondent was erroneous. The respondent states that the plaintiff failed to make a case properly submissible to the jury, and that therefore any error in instructing the jury is of no consequence.

The only evidence that we have is that offered by the plaintiff, as the defendant stood upon its motion for a directed verdict at the close of the plaintiff's case. The facts as disclosed by this evidence are that the plaintiff, Dorothy DeManuele (then named Dorothy Stauffer), had lived with Louis Fox and his sister, Loretta Fox. These two were, respectively, claimant's maternal uncle and aunt. They were both unmarried. Dorothy came to live with them after her father died in 1940. She was then nineteen years of age. Her brother also moved in with the uncle and aunt at the same time. The residence that they occupied was on Lisette Avenue, in the City of St. Louis.

Most of the evidence offered was the testimony of plaintiff's brother James. He stated that when they both moved to the home of their aunt and uncle, he was employed, and that he started to pay $10 a week board. Their father "had some insurance, it was paid so much a month." The insurance was paid to the uncle and aunt for the support of James and Dorothy. Dorothy was attending school. This she continued to do for about five months, and then she was employed as a secretary. After she secured employment, she also started to pay $10 a week board. They both continued with this arrangement until March of 1942, when plaintiff's brother James went into military service. He did not return to live with his aunt and uncle for any extended period of time until 1945. He had married then and left the service, and he returned with his wife. He and his wife both lived in the Fox home for about six months, and then they moved to a place of their own. In 1948 James and his wife moved away from the city, but returned to live in St. Louis in 1950. During all of this time the plaintiff continued to live with her uncle and aunt. The aunt performed all of the household duties, and the uncle was employed as a plumber. Occasionally Dorothy would help the aunt, performing such chores as setting the table and going shopping with her, but this was not a regular occurrence.

In October of 1955, Dorothy's aunt went to the hospital, and she died in December of the same year. This left only Louis Fox and Dorothy living in the house, and they both lived there until March or April of 1957. James said that he visited them at least once a week. He said that during these visits, he saw his sister Dorothy doing the washing and ironing, cooking, and most of the shopping. He said that he saw her doing housecleaning. Some of the clothing that she washed and ironed belonged to Louis Fox. When he visited he never saw his uncle doing any housework. He also said that Dorothy continued to pay board. She was employed by the Veterans Administration during this time. A next-door neighbor also testified that Miss Fox, the aunt, had done all of the housework prior to going to the hospital, but that after Miss Fox died she saw Dorothy prepare meals, do general housework, and shopping.

Louis Fox was a man who drank considerably, and according to James he had done so for many years. He was an unstable person and easily angered. He displayed no affection for Dorothy and found fault with her friends. He did not want her to go out. The neighbor testified that she was informed by Dorothy that her uncle did not want her to work or to have any social life. On one occasion the neighbor saw Fox come home intoxicated and heard him later using abusive language toward Dorothy. She said that Fox used profanity like most people talk normally. She said, " * * * he had the idea Dorothy's morals weren't what they should be. * * * he called her a whore." She said that Fox was frequently intoxicated and that he always smelled of alcohol.

James Stauffer testified that in July or August of 1956, he was down in the basement of the Fox home with his uncle. James related the conversation which he had with his uncle at that time as follows: " * * * he was drinking beer, and he told me he didn't know why she wanted to leave him, that she would be taken care of in his will."

As to any agreement that existed between Dorothy and her uncle, James gave the following testimony:

"Q. Do you know of your own knowledge, Mr. Stauffer, what the financial details were, if any, of any contract or agreement that existed or may have existed between Mr. Fox and Dorothy?

"A. Well, would that tie in with the verbal agreement we had when we first went in there? We had a verbal agreement at the time.

"Q. I have to tie it down for the period for which the claim was filed. The claim was filed for October, '55, to April of '57. Do you know of your own knowledge whether or not Dorothy and Louis Fox had an agreement with certain specified sums that she would pay him?

"A. I don't know of the agreement, no.

"The Court: How about an agreement, whether it was in writing or not?

"The Witness: The best I recall, there was a verbal agreement, Judge."

James also testified that in March or April of 1957, his sister telephoned him in a state of excitement, and he went to the Fox home. Fox, Dorothy, and two policemen were there. Dorothy said that she could not stay any longer, and that her uncle would not give her her clothes. The policeman told her to get her clothes. Fox asked her to stay, but the policeman told her to get her clothes and get out. This she did, and James took her to his home.

Dorothy was married shortly after this to Mr. DeManuele, with whom she had been going since 1955. Fox continued to live in his home for about a year. He then moved to a hotel and lived there until he died. The date of his death is not disclosed by the record.

■ As stated, there was a judgment for the defendant administrator, and the plain-tiff-appellant here contends that she should have a new trial because an instruction given was erroneous. The plaintiff's petition stated a claim for services rendered and money spent for and on behalf of the decedent. She did not prove or submit in the instruction offered in her behalf any claim for money spent, but confined the instruction to services rendered. The defendant offered and the court gave an instruction directing a verdict for the defendant if the jury was "not able to make a finding that Mrs. DeManuele rendered services and *spent money on behalf of Louis Fox * * *.*" (Emphasis ours). The instruction does conflict with the plaintiff's verdict-directing instruction, in that it requires them to find money spent by the plaintiff, and it is therefore erroneous. Guidicy v. Guidicy, 361 Mo. 1127, 238 S.W. 2d 380; St. Louis Housing Authority v. Bainter, Mo.Sup., 297 S.W.2d 529; Lasley v. Ridenour, Mo.App., 265 S.W.2d 744.

■ The respondent quite properly asserts that if the plaintiff failed to make a case submissible to a jury, we cannot grant a new trial because the error complained of would be immaterial. Kirks v. Waller, Mo.Sup., 341 S.W.2d 860; Graves v. Atchison, T. & S. F. Ry. Co., 360 Mo. 167, 227 S.W.2d 660.

■ In considering whether or not a submissible case was made, we apply the established rule that the evidence most favorable to the plaintiff must be accepted as true, and that plaintiff must be given the benefit of all reasonable inferences arising from such evidence Ashley v. Williams, 365 Mo. 286, 281 S.W.2d 875, 1. c. 877, and cases cited therein.

■ The rule relating to claims for services in cases such as this is that where a family relationship exists, a presumption ordinarily arises that there was no intention to pay and no intention to charge for services of the nature of those here considered. The plaintiff contends that no family relationship existed here. We are cited to the

following cases, all of which deal with the subject of family relationship. Patrick v. Crank, Mo.App., 110 S.W.2d 381; Farris v. Faris' Estate, Mo.App., 212 S.W.2d 71; Kopp v. Traders Gate City Nat. Bank, 357 Mo. 659, 210 S.W.2d 49; Wells v. Goff, 361 Mo. 1188, 239 S.W.2d 301; Lillard v. Wilson, 178 Mo. 145, 77 S.W. 74.

In these cases family relationship is discussed from a variety of angles, but none of the facts considered are comparable to those before us.

■ The facts here simply show that Dorothy lived in the home of her aunt and uncle. Apparently their father had left some insurance for the partial support of both Dorothy and her brother. How much it was, or to whom it was payable, was not developed in the evidence. Dorothy and James both paid $10 a week board. It is certainly customary for employed adults to contribute to their own upkeep in any family. Up to the time of the aunt's last illness, it was apparently like any other household where all were employed, except the aunt, who did the housework, with occasional help from Dorothy. After the last illness of the aunt, Dorothy continued to work and live in her uncle's home. He apparently continued to work, also. Dorothy did housework, cooking, and laundry. James, who called about once a week, never saw his uncle doing housework, and neither did the neighbor, who was seldom in the home. As stated in Steva v. Steva, Mo.Sup., 332 S.W.2d 924, 1. c. 926, our Supreme Court stated:

"The term 'family,' within the rule under discussion, 'has been defined as a collective body of persons under one head and one domestic government, who have reciprocal, natural, or moral duties to support and care for each other.' "

■ This was what was present here, despite the fact that the head of the household spoke disparagingly of his niece's conduct and was himself unruly and often "in his cups". His misdirected concern about his niece's activities was not the concern which one with no family interest would manifest. It was his home; Dorothy was living in it. They had some monetary arrangement which no witness knew about. There certainly was a family relationship here, disagreeable as it may have been. Wells v. Goff, 361 Mo. 1188, 239 S.W.2d 301, supra.

The appellant states that the facts overcome the presumption that the services were gratuitous, even though a family relationship did exist. She asserts that the case is similar to McDaniel v. McDaniel, Mo.Sup., 305 S.W.2d 461. In that case the evidence was that two granddaughters decided to leave the grandparents' home to seek employment. There was a family argument about it, and one of the granddaughters testified: "Grandpa told her (the sister) * * * 'If she stays they would give her a good deal.' * * * She gave in and she stayed." She did burdensome work in a primitive farm home, and nursed both her grandmother and her grandfather in their last illness.

■ The statement made in this case was not made to the claimant, or in her hearing, as it was in the McDaniel case, supra. Her brother testified that the uncle said, "He didn't know why she wanted to leave him, that she would be taken care of in his will." This indicates no agreement, but a lack of one. The few months which the claimant remained in the Fox home after the statement was made certainly would not indicate any agreement was reached. She never gave up her employment, as the uncle desired, and the services she rendered appear to be of slight consequence, as the meals she prepared and the laundry that she did were for her own as well as her uncle's benefit.

■ We hold that the plaintiff failed to make a submissible case, as there was a family relationship between her and her uncle which, because of no agreement to

the contrary, made such services as she rendered to him a mere gratuity.

The judgment is affirmed.

RUDDY, P. J., and ANDERSON, J., concur.