Fred S. CHAPPELL and Edna E. Chappell, Respondents,

v.

The CITY OF SPRINGFIELD, Missouri, a Municipal Corporation, Appellant.

Earl and Earleene HATFIELD, Husband and Wife, B. F. and Lela H. Flanigan, Husband and Wife, Dale and Virgie Sissel, Husband and Wife, Don R. and Betty Rader, Husband and Wife, Emerson and Helen M. Taylor, Husband and Wife, John and Vivian Jackson, Husband and Wife, Junior and Hazel J. Yenicheck, Husband and Wife, Dwight and Bessie Hutchinson, Husband and Wife, Charles and Ruth V. Hutchinson, Husband and Wife, Respondents,

v.

The CITY OF SPRINGFIELD, Missouri, a Municipal Corporation, Appellant.

No. 50473.

Supreme Court of Missouri, Division No. 2.

April 12, 1965.

White, Dickey & Skelton, Turner White, Springfield, Lincoln, Haseltine, Keet, Forehand & Springer, Horace S. Haseltine, Springfield, for respondents.

John B. Newberry, Springfield, for appellant.

EAGER, Judge.

This appeal arises from the trial of two consolidated actions in each of which the

plaintiffs charged the defendant city with the operation of a continuing nuisance in connection with its sewage disposal plant southwest of the city. One suit was instituted by Fred S. Chappell and his wife, the other by nine different married couples. These various plaintiffs were the owners of separate tracts in the vicinity of the plant, located in various directions and at various distances from it. The distances varied from one quarter of a mile to one mile, and the directions from south to southwest to northwest to north to southeast. Their tracts varied in size from relatively small suburban tracts to farms well in excess of one hundred acres. All lived on their respective tracts and all the homes were modern dwellings. The trial was had in Dallas County on changes of venue, and this appeal is from an order granting a new trial to the respondents, after verdicts for the appellant.

In 1959 the City of Springfield completed the construction of a new sewage disposal plant on a forty-acre tract a few miles southwest of the city; it cost approximately $3,300,000, and a much larger bond issue was passed in order to permit rehabilitation of the sewer system generally. This was located in what was essentially a farming area but it has, as stated, become a mixed area of farms and suburban homes with substantial acreage. The plant went into full operation in January, 1960. It is described as an "activated sludge treatment plant," specially designed for Springfield, with the "Kraus" process designed into the system for the purpose of taking care of heavy industrial waste. The latter process is not more specifically described. The plant was described by plaintiffs' expert as a good one, with a question as to a lack of capacity in certain respects. The main sewage line to the plant runs for approximately four miles from an old disposal plant.

In 1960 all these same plaintiffs filed ten separate suits against the city, claiming damages for the creation of a temporary

nuisance by reason of the odors created and distributed by this disposal plant. Nine of the cases were consolidated; the trial resulted in nine separate verdicts of $4,000 against the city, being one for the owners of each tract. On appeal, the judgment in that case was affirmed on the theory of temporary nuisance. Flanigan v. City of Springfield, Mo., 360 S.W.2d 700. The Court there said at loc. cit. 703–704 (quoting in part): "Later, that court in Hillhouse v. City of Aurora (1958), Mo.App., 316 S.W.2d 883, 887, approved and followed the Newman case [Mo.App., 292 S.W.2d 314], supra, and stated (loc. cit. 888 [3]): 'Where riparian landowners seek to treat as temporary and abatable the damage resulting from operation of a permanent municipal sewer system * * *, and where the temporary and abatable character of the nuisance and resulting damage is not conceded expressly or in necessary effect (contrast the Newman case, supra), we think that recovery by the landowners, as for damage resulting from a temporary and abatable nuisance, should be permitted only upon evidence from which the triers of the facts fairly and reasonably may infer, and actually do find, that it would have been both *scientifically possible* and *reasonably practicable* for the offending municipality to have abated the nuisance when the landowners' cause of action accrued.' * * * In these circumstances we conclude it was a jury question whether it was scientifically possible and reasonably practicable for defendant to have so operated its plant that foul and noxious odors would not have escaped therefrom." The evidence there was very similar to the evidence here, except for matters which we shall specifically mention. That judgment was satisfied, releasing all damages to and including March 27, 1961, and a settlement was made with the Chappells (whose case was not tried) on the same basis.

In this suit all plaintiffs claim damages separately for a continued and continuing nuisance from the odors created by the

plant since March 28, 1961. They allege in substance (omitting formalities and nonessentials) that: defendant has caused and permitted foul and noxious odors and gases to emanate and escape from its plant, which are carried by normal air currents over the properties of plaintiffs; that the plant incorporates all modern designs and developments necessary to prevent such odors from existing beyond the boundaries of defendant's tract and that it was and is "scientifically possible and reasonably practicable" for defendant to so operate its plant; all to the damage of plaintiffs in modes to be mentioned later and in varying amounts. In one petition it was alleged that the plant had been overloaded from its inception, particularly in its "digester" capacity, and that "sludge" is deposited in a sludge bed on the plant site which adds to the noxious odors. Upon the trial the jury returned ten separate verdicts for the city and against each separate pair of plaintiffs. Subsequently, the Court granted new trials as to all plaintiffs except the Hatfields, the Flanigans and the Sissels, on the stated ground that the verdict was "contrary to the weight of the evidence." From that order the defendant has appealed. Those plaintiffs whose motions were overruled have not appealed, and they are not to be considered on this appeal.

The points made here by appellant city may be stated as follows: that its motion for a directed verdict at the close of all the evidence should have been granted because the evidence of plaintiffs and of their experts demonstrated that the odors came *either* from defendant's plant or from "sludge" spread on neighboring fields (which latter phase will be mentioned in discussing the evidence), that all the evidence was so indefinite that a determination of the cause or source could only be arrived at by speculation, and that the existence of odors from spreading the sludge on the fields was not an issue; also, that any discretion residing in the trial court for the granting of a new trial on the ground assigned was arbitrarily exercised, since it

granted new trials to some plaintiffs and denied them to others.

The respondent plaintiffs assert: that defendant's motion for a directed verdict was insufficient (to which we shall refer later); that all plaintiffs made clearly submissible cases; that it was within the Court's discretion to grant new trials to some plaintiffs and not to others; and, that the noxious odors created both at the plant and by spreading the sludge were wrongful acts. We have jurisdiction, since the claims of the present plaintiffs aggregate well over $100,000.

■ Our consideration will necessarily involve a review of the evidence to determine whether, in fact, these plaintiffs made submissible cases. Where the Court grants plaintiffs a new trial upon the ground that the verdict is against the weight of the evidence, an appellate court will not ordinarily interfere if there was substantial evidence to justify the submission of the case to the jury and to sustain a verdict for the plaintiffs. Allman v. Yoder, Mo., 325 S.W.2d 472; Berry v. Harmon, Mo., 323 S.W.2d 691; Andres v. Brown, Mo., 300 S.W.2d 800; Graves v. Atchison, Topeka & Santa Fe Ry. Co., 360 Mo. 167, 227 S.W.2d 660. We examine the submissibility in view of the issues submitted. Allman, supra. We need not dwell here on the latitude permitted trial courts, generally, in such matters. Madsen v. Lawrence, Mo., 366 S.W.2d 413.

■ At some time after the completion of the plant the city began hauling its "sludge," which is the solid or semi-solid product remaining after the treatment process, out to neighboring fields in tank trucks and spreading it. This was one of two or three methods of disposition and the practice was followed, of course, only on those tracts where the owners wanted and accepted the sludge as a fertilizer or soil conditioner. Three of the plaintiff couples accepted this product, and much was spread on other fields in the neighborhoods of the

various plaintiffs. The amended petitions did not charge that these acts of defendant constituted any part of the nuisance. When the subject arose during the trial, plaintiffs sought leave to amend, but this was refused on defendant's objections. Consequently, the issue submitted to the jury was whether plaintiffs had been damaged by reason of the fact that defendant had "permitted or caused foul and noxious odors to escape from its plant * * *," when it was "scientifically possible and reasonably practicable for defendant, City, so to have operated the said plant * * *" that the odors could have been eliminated. The apparent theory of the trial court, necessarily adopted by the parties, was that defendant might be held liable for offensive odors escaping from its plant or from the sludge beds on its own tract, but not for odors from sludge spread elsewhere; this, for the reason that no such claim had been pleaded and that it would be unfair to so broaden the issues during the trial. Defendant seems to concede that plaintiffs produced substantial evidence to show that offensive odors were allowed to escape from the plant, but it insists that there was also evidence of odors from the sludge spread on the fields, and that the jury could not differentiate or establish the causation without speculation. Thus, counsel say, Appellant's Brief, p. 9: "Where, as here, Respondent has produced testimony of their own which would be sufficient to support two different theories for the cause of the injuries complained of and where only one cause for such injuries is plead and relied on in the Petition, it is error to submit such a cause of action to the jury." From this point we must examine the evidence. Under this procedural situation we consider the evidence in the light most favorable to plaintiffs, and give them the benefit of all favorable reasonable inferences therefrom. City of St. Charles v. DeSherlia, Mo.App., 308 S.W.2d 456, 459; Southwestern Bell Telephone Co. v. Dean Construction Co., Mo., 370 S.W.2d 270, 274.

Plaintiffs produced as a witness a highly qualified engineer specializing in sanitary engineering; he had visited the plant on several occasions during the period in question, and had examined both its plans and specifications and its monthly operating reports, with full cooperation from the city. The following recitals constitute the substance of his testimony, for our present purposes. "Septic" sewage means that which is devoid of oxygen, often dark and with an offensive odor; this witness was of the opinion that "septic" sewage had entered the plant, although what he saw "bordered" on being septic; sewage will become septic from warm weather and from a long run in sewer pipes, and the run here from the old plant was about four miles; in the "aeration" process septic sewage would give off various gases with foul odors; here, gases had also escaped through water seals on top of the "digesters," which could have been prevented by drawing off the gas when the pressure got too high; septic conditions can be prevented by the use of chlorine in the sewer lines, or by the use of ozone or ferrous sulphate, and perhaps by other methods; that, if handled properly, the "pre-aeration process" would not release odors; that the reports of the plant indicated that the sewage was not kept in the digesters for a sufficient time (35 to 55 days) and that it was unstable, having too high a percentage of volatile material, and that this will give off a "slight odor"; that on many days (judging from the records) the plant had received "very strong sewage"; that in his opinion odors had existed at the "influent pipe" where the sewage enters; there was also the "possibility" of the escape of gases from the digesters; and there were some odors from the unstable sludge (much of which was placed in sludge beds on the plant property); that if the sewage was not septic, there should be no odors away from the plant site; that hydrogen sulfide, the gas often expected, turns lead acetate dark; that the sludge would have a musty, tarry smell when spread, but as it dried it would become a

"stable humus"; that people would ordinarily learn the characteristic odor of the sludge; that if people had smelled an odor of hydrogen sulfide in large quantities or a smell like rotten eggs he would be "inclined to be suspicious of the plant"; and, if it was a "gassy" smell he would "suspect" that it came from the plant. This witness stated that there had been an improvement in the operation of the plant since June, 1962. (This case was tried in July, 1963.)

A retired science professor, Dr. Otto Smith, who had specialized in water and sewage work, corroborated some of the foregoing. Essentially, he testified: that there were odors both from the gases in the plant and from the sludge; that the former could be eliminated by watching the incoming sewage and treating the sewer lines; that the human nose is more sensitive to hydrogen sulfide than are the lead acetate tests.

The various plaintiffs testified in detail, some very graphically, about the odors they had encountered more or less continuously since March 28, 1961. One (Mrs. Chappell) had kept notations of the days on which they were offensive, including approximately ninety such occasions; she lived three-fourths of a mile north of the plant where she got the effect of the prevailing southerly winds coming up a draw. She described the odors as like "out door privies"; her records were admitted in evidence. This witness testified that at various times she was awakened in the night by these odors, got up and closed the house and sprayed with a deodorant; that at times visitors would leave her home on account of the "sewage odors"; that they were sickening, and that they came from the direction of the sewage plant with southerly winds. Sundry other plaintiffs testified in like manner that the odors were very offensive, that they were embarrassed to have company, that their meals and sleep were interfered with, that the smells were "sewage" smells, putrid, nauseating, "gassey" smells, and like the odor at the plant. Some noticed the odors more at night. One family had put its home up for sale on account of the odors. Some thought the smells were less frequent in recent months, but just as bad when they did come; one witness, however, testified that he had smelled the odors 57 times in 1963. The evidence would justify a finding that the odors had seriously interfered with the enjoyment, by plaintiffs, of their homes. Several of the plaintiffs testified definitely that they had become familiar with the smell of sludge spread on the fields; that it was a "musty" or "tarry" smell, and not similar to the nauseating, raw sewage smells about which they were complaining and which some of them had smelled at the plant.

Statements from the deposition of Mr. Paul Hickman, Chief of Sanitary Sewage, indicated: that a chemical had been placed in the lines at the old plant upon occasions, for odor control; that "We had lots of odor"; that the sewage became slightly septic in certain instances, but that the odors had occurred only "in spots" since July or August, 1962; that the chemical was used when they were "going to have a tour," presumably visitors at the plant.

We need not notice defendant's evidence, except as it may have aided the plaintiffs. It was shown that papers soaked in lead acetate and painted boards were not discolored when placed on fences, etc., surrounding the plant, but that on many occasions those placed near the pre-aeration tanks turned dark from contact with hydrogen sulfide; this place was where the raw sewage came into the plant. From Mr. Hickman's testimony it further appeared: that the sludge had continued to contain a higher than normal percentage of volatiles; that there had been odors at the plant a few times since March, 1961, and that the designing engineers had recommended that the "biochemical oxygen" capacity should be increased; that it was not unlikely that at "low flow" the sewage was sometimes slightly septic; also, that the load of the plant had grown faster than was originally

projected, and that the plant had reached, and at times exceeded, its design capacity. One of defendant's witnesses, living about half a mile from the plant, testified that he had smelled the odors only a few times since March, 1961, but that on three or four occasions when it was "unbearable," he called city or plant officials and the odor soon stopped, once within fifteen minutes.

At the close of plaintiffs' case defendant offered an oral motion for a directed verdict which was denied. At the close of all the evidence its counsel again offered such a motion "on the grounds that the evidence, as adduced by the plaintiffs, and the inferences made by plaintiffs and the evidence presented by plaintiffs are so speculative that the jury cannot reach a determination as to where the source of the odors might have come from and, therefore, plaintiffs have not made a submissible case." The motion was prefaced by the suggestion that it was made at the close of all the evidence, as in fact it was. The inadvertence in the motion was that counsel therein referred to the evidence of plaintiffs and the inferences therefrom, instead of to "all the evidence." Defendant, citing the well-known rule that a defendant who offers evidence waives such a motion made at the close of plaintiff's case, also says that this motion was merely a repetition of the previous motion made at the close of plaintiffs' case which motion had already been waived, and that it was valueless; so that, counsel say, the question of whether all the evidence made a submissible case for plaintiffs was not brought to the attention of the trial court. The cases cited approve the general rule, but they are not applicable on these facts. This was a rather inept motion, but we feel certain that the trial court understood, as do we, that counsel was attacking the submissibility of the case on all the evidence, and we shall so consider it. The basic reason for the motion was stated, and that was the same point which defendant briefs here. That question had been raised specifically by objections to evidence through much of the trial and it had also been considered upon plaintiffs' request for leave to amend. There could have been no misconception on the part of the trial court. The point is rather technical and it is denied.

The parties argue pro and con as to whether the trial court abused its discretion in granting new trials to some of the plaintiffs and not to others. On this subject, generally, our Civil Rule 78.01, V.A.M.R. is very broad. It seems that those plaintiffs who were unsuccessful on their motions had permitted sludge to be spread on their land. We need not defend here the logic or illogic of this ruling. Those plaintiffs whose motions had been overruled did not appeal. They are entirely out of this case. If the Court committed error as to them, the defendant is not aggrieved by the ruling, having thus disposed of three of the claims against it. It may not complain here.

We merely decide whether there was substantial evidence to make out a submissible case for those plaintiffs who are respondents here. We conclude that there was. The issue was whether or not foul and noxious odors had been caused to come from the sewage disposal plant, and whether it was scientifically possible and reasonably practicable for the defendant to have prevented this. Defendant does not argue here the latter phase of the issue, only questioning whether there was sufficient evidence to permit the jury to decide, without speculation, whether the odors came from the plant. The trial court may only sustain a motion for a directed verdict where the facts in evidence and the reasonable inferences therefrom are so strongly against the plaintiff as to leave no room for reasonable minds to differ. Justice v. East St. Louis City Lines, Inc., Mo., 375 S.W.2d 150; Nelson v. O'Leary, Mo., 291 S.W.2d 142; DeLay v. Ward, 364 Mo. 431, 262 S.W.2d 628. We recognize fully that, in considering such a question, issues which would rest merely in speculation and not on substantial evidence may not be submitted

to a jury. Osterhaus v. Gladstone Hotel Corp., Mo., 344 S.W.2d 91; Thompson v. Jenkins, Mo., 330 S.W.2d 802. We need not review again the applicable evidence. Various plaintiffs had smelled the odors of the sludge after it was spread and they distinguished those from the odors of the plant; they testified also that the latter odors were far more offensive; these latter odors usually came with a wind from the direction of the plant; some of the plaintiffs had been at the plant and had smelled the odors there; the testimony of at least one of plaintiffs' experts tended to establish that the more putrid odors came from the plant itself and that there were practicable and effective methods of eliminating them. In defendant's evidence it was essentially admitted that there had been an odor problem at times, and that the plant had, at times, been operating beyond its capacity in certain respects. From all the evidence we are convinced that there was substantial evidence to justify the submission of the issue of the plant odors and damage therefrom; it was not necessary that the plaintiffs should prove that all odors they encountered at any time came from the plant. They were merely not permitted to recover in this case for any inconvenience or damage caused by odors from sludge spread on the fields. In view of our conclusions, we may not interfere with the exercise by the trial court of its discretion in granting new trials to the respondents and we hold that its discretion therein was not abused. It seems probable that before another trial the pleadings may be so amended as to avoid some of the controversy which has been present here.

If the readers of this opinion are, perchance, caused any discomfort by reason of its unsavory content, let them consider that the writer has been required to read and consider in detail several hundred pages of a more graphic description, and in cool weather with the windows largely closed.

The order granting new trials to respondents is affirmed.

All of the Judges concur.